(82 South. 377)

Nos. 22748, 22751, 22752, and 22756.

In re LIQUIDATION OF MITCHELL-BORNE CONST. CO.

SOUTHWESTERN SURETY CO. v. MITCHELL-BORNE CONST. CO. et al.

(June 2, 1919.)

*(Syllabus by Editorial Staff.)*

1. PARTNERSHIP ⬤⟿305 — RECEIVERSHIP — CLAIM OF PARTNER CONTRIBUTING SKILL AND EXPERIENCE.

Where four orally formed ordinary partnership to undertake a certain construction contract, and one partner furnished no cash but was to contribute his time and experience and to have an equal share of profits, and, after dissolution and completion by receiver, there was an actual loss, leaving an amount for distribution to creditors, etc., he was not entitled to receive any part thereof, where he had received a fair compensation for his services.

2. PARTNERSHIP ⬤⟿303, 305—CONTRIBUTION OF TIME AND EXPERIENCE—SHARE IN LOSS.

Where four orally formed ordinary partnership to perform a certain construction contract, and one partner furnished no cash but was to contribute his time and experience and to have an equal share of profits but was not to be liable for losses, and, after completion by receiver, there was an actual loss, leaving an amount

for distribution to creditors, etc., he would not be called upon to make larger contributors whole, but, at its termination, the parties should be restored as nearly as possible out of common assets in proportion and forms in which they first contributed.

3. PARTNERSHIP ⬤⟿11 — LIABILITY FOR LOSSES.

An agreement that one partner, putting in no cash but contributing his time and experience for an equal share of the profits, should not be responsible for any losses, was void even as between the partners, in view of Rev. Civ. Code, art. 2814, though article 2843 permits them to modify or limit such liability as between themselves.

4. PARTNERSHIP ⬤⟿165—LIABILITY OF PARTNERS.

Each partner is liable in commercial partnership, in solido, a l in ordinary partnerships, for his virile share.

5. PARTNERSHIP ⬤⟿325(1)—APPOINTMENT OF RECEIVER—POWER OF COURT.

Notwithstanding the absence of any express statutory provision for appointment of a receiver to a partnership, even where that juridical entity is still extant, and not, as in this case, dissolved by death of a partner, the courts under their equity powers as found in Rev. Civ. Code, art. 21, may appoint a receiver.

6. PARTNERSHIP ⬤⟿325(2)—APPOINTMENT OF RECEIVER—JURISDICTION OF COURT—ESTOPPEL.

Where partnership was dissolved by death of a partner and one of the partners, appointed a receiver, completed partnership contract under an arrangement acquiesced in by partners, their representatives, creditors, and the sewerage and water board which had let the contract, at great benefit to partners and creditors alike, they could not be heard, on opposition to his final account, to complain that court had no power to appoint a receiver.

7. RECEIVERS ⬤⟿154(2)—ATTORNEY'S FEES—AMOUNT.

Where an ordinary partnership, formed to perform a contract with sewerage and water board of city of New Orleans at a contract price of $541,188.83, was dissolved after performance of only 5 per cent. of work, and one of original partners was appointed receiver and completed contract, his attorneys, who during four years faithfully and efficiently recovered on bond of former absconding receiver, defended suits for damages, put off creditors, obtained funds from

board, borrowed money, defeated board's claim for demurrage, etc., were properly allowed a fee of $19,000.

**8. PRINCIPAL AND SURETY ⊕≈180—SURETY FOR PARTNERSHIP — CLAIM AGAINST RECEIVER.**

Where a partnership applying for a bond agreed to indemnify surety for damages, etc., in consequence of its suretyship, and to reimburse its payments by reason of bond and to furnish expense and costs of any defense by surety, whose decision should be binding on indemnitor, surety could not recover for legal services in anticipation of loss under bond when none actually occurred; though, where it was called upon to defend suits against it and the indemnitor, it was entitled to services and expenses incurred.

**9. CONTRACTS ⊕≈156 — CONSTRUCTION — SPECIFIC PROVISIONS.**

General provisions of a contract are controlled or limited by specific stipulation dealing with a particular matter.

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

In the matter of the liquidation of the Mitchell-Borne Construction Company, in which oppositions were filed to the final account of Michael Mitchell, receiver, by the New Orleans Railway & Light Company, William F. Kelly, John O. Chisholm, the Southwestern Surety Company, succeeded by the Southern Surety Company, and Mrs. E. D. Borne, widow and administratrix of the estate of Benjamin W. Borne, deceased, which oppositions were consolidated for trial on the merits, and direct action against the receiver and the individual partners, including the administratrix, by the surety company. Judgment in favor of the receiver dismissing all the oppositions and approving his account and rejecting the demand of the surety company, and opponents, except the New Orleans Railway & Light Company, and the surety company appeal. Judgment amended so as to include, for payment out of funds in his hands a certain amount to the surety company, and otherwise affirmed, and judgment against the surety company reversed, and ordered and decreed that it have and recover judgment against defendants for a certain sum with costs.

Charles Louque, of New Orleans, for appellant John O. Chisholm.

Farrar, Goldberg & Dufour, of New Orleans, for appellant Southern Surety Co.

Conrad G. Collins, of New Orleans, for appellant administratrix of estate of Benjamin W. Borne.

John C. Davey, John P. Sullivan, and N. E. Humphrey, all of New Orleans, for appellee Michael Mitchell, receiver of Mitchell-Borne Const. Co.

J. C. Hollingsworth and Carroll & Carroll, all of New Orleans, for appellee W. F. Kelly.

DAWKINS, J. These consolidated cases embrace appeals by certain members of the firm of Mitchell-Borne Construction Company, and by certain creditors of the partnership, from a judgment of the lower court dismissing their oppositions to the final account of the receiver or liquidator of that concern; also, the appeal of the plaintiff in the case of Southwestern Surety Company against the said partnership in liquidation, in which the said surety company brought a direct action for the recognition of its claims.

Mitchell-Borne Construction Company was an ordinary and particular partnership, composed of Michael Mitchell, Benjamin W. Borne, John O. Chisholm, and William F. Kelly, formed early in January, 1913, by oral agreement, for the specific purpose of undertaking the performance of a certain contract, known as No. 50-D, with the sewerage and water board of the city of New Orleans, covering the construction of a canal on Broad street from the lower side of St. Bernard avenue, to a point near Carondelet walk, and also a branch canal and pipe line in Lapey-

rouse and Mauperas streets and Esplenade avenue, and a siphon under the Carondelet Navigation Canal, together with approaches, etc., and for a contract price of $541,188.83. To the original working capital, the partners contributed as follows: Mitchell, $10,908.47; Borne, $10,947.23; and Chisholm, $4,270.15. Kelly put up no cash, but agreed to contribute his time, skill, and experience, and the profits were to be divided equally among all the partners. In order to insure faithful performance of the contract, the sewerage and water board exacted bond of Mitchell-Borne Construction Company (hereinafter called the contractor) in the sum of $125,000, which was furnished with the Southwestern Surety Insurance Company (subsequently succeeded by Southern Surety Company thereinafter referred to as the surety), as surety.

Work was begun, and, before it had progressed as much as 5 per cent. towards completion, a disaster, in the shape of a collapsed cofferdam, occurred, in which one of the partners, Borne, and several of the employés, lost their lives. Thereupon a receiver or liquidator was appointed to the partnership, in the person of one T. Walter Danziger, who was authorized by the lower court to proceed with the contract. Work was resumed, and, after some months' operations under his management, Danziger absconded, and investigation revealed that he was short more than $26,000, in his accounts. The court then appointed Michael Mitchell, one of the former partners, receiver in his stead. The work was again resumed and finally completed after nearly four years, when the contract had provided for its performance in 18 months.

On November 16, 1916, the receiver, Michael Mitchell, filed what was termed his "final account," showing a balance on hand of $37,751.84, which he proposed to distribute as follows:

Preferred Charges.

| | |
|---|---:|
| Dinkelspiel, Hart & Davey, John P. Sullivan and Arthur Landry, and N. E. Humphrey, attorneys at law, for professional services rendered herein | $19,000 00 |
| John P. Sullivan, costs of court advanced.. | 43 97 |
| John P. Sullivan, amount paid recorder of mortgages for the parish of Orleans, for cancellation of inscriptions | 45 00 |
| Amount reserved for filing this account, publishing same, future costs and discharge of receiver | 500 00 |
| American Surety Company of New York, receiver's bond up to October 12, 1916.... | 66 00 |
| H. Bodenheimer & Sons, insurance under surety bond, for construction of canal under contract | 1,763 50 |
| Total privileged claims | $21,418 47 |
| Amount in bank | $37,751 84 |
| Privileged claims | 21,418 47 |
| Balance | $16,333 37 |

Inasmuch as there were no profits resulting from the enterprise, the receiver, therefore, proposed to return to and distribute, among the three partners who had contributed the cash capital, the sum remaining in his hands in the proportions which might appear correct upon an accounting between the partners.

Thereafter, on November 18, 1916, a supplemental account was filed, in which it was set out that through error the claim of one Elkin Moses, appointed by the lower court as expert accountant and auditor, had been omitted, and the receiver asked to include thereon a fee of $2,000 for this service, and that the same be paid as a privileged claim. This, of course, reduced the net amount for distribution to the sum of $14,333.37.

In due season, oppositions to the said account were filed as follows:

(1) New Orleans Railway & Light Company, claiming to be a creditor in the sum of $630.15, and, in which opposition, the account was attacked on the grounds that it did not set forth the assets and liabilities of the partnership, did not show how the assets had been disposed of, nor in what manner the sum proposed for distribution had

been arrived at. In the alternative, it opposed all items on the liability side of the account, and particularly the attorney's fees, as well as the proposed distribution of the residue among the partners. It further complained that it had not been placed upon the account as a creditor for the amount claimed.

(2) The opposition of William F. Kelly, one of the partners, on the ground that he was a creditor and entitled to one-fourth of the remaining assets by virtue of his having been one of the partners in the original undertaking. He also opposed the attorney's fees as being excessive, and averred that the sum of $3,000 would be sufficient to justly compensate for the services rendered; that the claim of Elkin Moses, public accountant, was excessive, because of the fact that the receiver had in his employ a regular bookkeeper and accountant, in addition to Moses, who kept the books and accounts.

(3) The opposition of John O. Chisholm, another partner, whose objection was mainly to the item of attorney's fees, which he claimed should be reduced to the sum of $3,000.

(4) Opposition of the Southern Surety Company, because of its having been placed on the account for the sum of only $1,763.50, when, as it claimed, it was due the additional amount of $6,002.74, or a total of $7,766.24.

(5) Opposition of Mrs. E. D. Borne, widow and administratrix of the estate of Benj. W. Borne, on the ground that the account was not such as is required by law; that it fails to charge each of the partners with an equal proportion of the losses; and that she was a creditor in the sum of $10,947.23, entitled to be paid in full. She asked that the account be ordered recast, and that she be recognized as a creditor for the amount claimed.

On December 18, 1916, the lower court homologated and approved the final account "so far as not opposed."

The Southwestern Surety Company also

145 La.—13

filed a direct action against the receiver and individual partners, including the administratrix of Borne, about the time of its opposition, and sought a personal judgment against all parties for the amount of its claim.

All of the oppositions, together with the suit of the surety company, after consolidation for the purposes of trial, were tried on their merits, and resulted in judgments in favor of the receiver dismissing all of the oppositions, and rejecting the demands of the surety company against the partnership and partners.

The opponents (except the New Orleans Railway & Light Company), as well as the surety company in its direct action, have appealed.

### Opinion.

[1-4] 1. Opposition of William F. Kelly: While Kelly opposed the account originally upon the contention that he was entitled, as a partner, to share equally in the funds remaining for distribution, and because of the alleged excessive amount allowed the attorneys for the receiver, the brief filed for him is devoted entirely to the matter of his nonliability for the losses of the partnership. Inasmuch as we shall discuss the item of attorney's fees further on, we forego the matter here.

As to Kelly's right to share in the funds remaining in the hands of the receiver, we think it clear that since he did not put up any cash, and no profits were made, but an actual loss of some $11,000, of the original cash capital contributed by his associates was suffered, he is not entitled to receive any part of this money. True, his time, skill, and experience must have been considered, in forming the partnership, as equivalent to the capital furnished by the other partners; but, if there had been a profit of say $10,000 realized above the cash capital, he would hardly have claimed that he was entitled to

receive one-fourth thereof, and also one-fourth of the amount necessary to reimburse his copartners. Otherwise, they would necessarily have suffered a loss, while he would not only receive a profit, but also 25 per cent. of the money originally invested, not one dollar of which did he put up, and would also have his skill and experience which was the asset originally contributed by him to the enterprise. Where, on liquidation, as in the present case, there is not sufficient funds left to repay the other partners the sums advanced, we do not think that one who put up merely his skill and time, and, in addition thereto, received a fair compensation from the partnership and receiver for his services, as did Kelly, can be permitted to participate in these funds.

"Where one partner furnishes no capital but contributes merely his time, skill and services, the presumption on dissolution of the partnership is that he is not entitled to any part of the firm capital; and even where the agreement is that the losses and profits are to be shared equally, the partner who contributes only his services is not entitled on dissolution to any part of the original capital." R. C. L. vol. 20, 1022, and authorities cited.

The question as to whether or not Kelly can be called upon, under the circumstances of this case, where the agreement was to share the profits equally, but, according to the testimony, he was not to be responsible for any losses, is not free from difficulty; not because of that stipulation, since it was void, even as between the partners (R. C. C. 2814), though the law does permit them to modify or limit this liability as between themselves (R. C. 2813); but because of the equitable considerations which exist in favor of each side, in such a controversy. The text-books and encyclopedias formulate certain general rules, in which they appear to treat a loss of capital just as any other loss of the partnership, and announce that each partner should share therein in the same

proportion as he would have participated in the profits, if any had been realized. However, an examination of the authorities cited in support of that doctrine has not revealed any case of the character presented here, or where the contributions of capital were unequal and the partnership agreement provided for the sharing of the profits equally. Where four men enter into a partnership, some contributing a larger and others a smaller amount of capital, and another no moneyed capital whatever, with the understanding that they shall share in the profits equally, they evidently, as between themselves, consider the contributions, in whatever amount or form made, equivalent. If such be the case, and the firm (which at last resolves itself into the individuals who compose it in the settlement of its affairs) receives those contributions, thereby acknowledging their equivalent value, how can it be said, if the enterprise proves a failure, that this was not true, and those who contributed the lesser amounts of money should put up more to make the larger contributors whole? In such circumstances, it is impossible, of course, to restore to the former the time expended, and such other considerations as were received and contributed during the life of the partnership; yet, as above indicated, they must have been considered of equal value to the undertaking. The effect of such a holding would be to deter men of skill and experience from entering into such enterprises, if, in addition to the possibilities of success which in all cases mainly influence the formation of such entities, they should know that they were to become, in effect, the guarantors of the investments of their associates. Of course, as to third persons, no such considerations enter into the matter, and each is liable, in commercial partnerships, in solido, and, in ordinary partnerships like the present, for his virile share.

We think the just and equitable view, and

the one best calculated to stimulate and clarify business dealings, is to treat the relation as a common undertaking in which the one agrees to risk his money and the other his time and experience, and that on dissolution or the ending of the enterprise, for whatever cause, the parties shall be restored as nearly as possible out of the common assets, in the proportions and forms which they contributed in the beginning. Evidently, this was the conclusion reached by the lower court, and we think it is correct.

2. Opposition of John R. Chisholm: This opposition raises exclusively the question of the correctness of the amount of fees allowed the attorneys for the receiver, amounting to the sum of $19,000.

The circumstances and conditions under which this receivership arose and was carried on were quite unusual, and somewhat novel in our procedure and practice. An ordinary partnership, formed for the special purpose of undertaking certain public work for the sewerage and water board of the city of New Orleans, and which ultimately involved the expenditure of more than $541,000, had performed less than 5 per cent. of the work, when the partnership was dissolved by the death of one of the partners. Thereupon, the partnership came to an end, and the usual and logical course to have pursued would have been to have immediately liquidated its affairs. The liquidator might have sold its property and assets, including the contract with the sewerage and water board, and applied the proceeds to the payment of the partnership debts; or, being unable to proceed further with the work, on account of the dissolution, the tangible assets, such as machinery, materials, etc., might have been sold and the proceeds applied pro tanto to the payment of the debts, and the sewerage and water board left to the necessity of re-advertising the work or engaging other persons to complete the contract, and charging the loss, if any, to the partnership and its surety; in which case, each individual partner or his estate would have had to bear his or its share of the loss.

However, by common consent or acquiescence (except as to the personnel of the receiver), both partners, surety, and the sewerage and water board, appear to have concluded that the matter could best be handled through a receiver. Accordingly, the application was made to the court below, the appointment was made, and the work finally completed after nearly four years, with very unusual results, in that all the creditors were paid, and a substantial portion of the capital originally invested left in the hands of the receiver for reimbursement to the partners.

[5, 6] There is no express provision in our statute law for the appointment of a receiver to a partnership, even where that juridical entity is still extant, not having been dissolved by the death of one of the partners (as in the present case) or otherwise. Yet we held, before the passage of the Act No. 159 of 1898 (the law providing for the appointment of receivers for corporations), that the courts had the authority, under their equity powers, as found in article 21 of the Revised Civil Code, to appoint receivers to corporations. We see no reason for a different view in the case of a partnership, which is likewise an association of persons for a common business or enterprise, with property and estate independent from the persons who compose it. But, in the case of corporations, the legal being continues regardless of who may be its stockholders, while the partnership ends with the death of one of the partners. We therefore think that in so far as the prosecution of the work under the contract of the Mitchell-Borne Construction Company with the sewerage and water board, by the receiver, except such as was necessary

to reasonably and seasonably liquidate its affairs, is concerned, the effect to be given to his administration must be treated more in the nature of an understanding, or at least an arrangement acquiesced in by the partners, their representatives, creditors, and the sewerage and water board. Under this view, having permitted the work to be continued and the services to be performed, without objection, the receiver beginning with a condition wherein the partnership owed many thousands of dollars, with comparatively small assets, and having, through good management, carried out the contract so as to produce the results above indicated, with such great benefits to partners and creditors alike, they cannot now be heard to complain, and the court is justified in treating the matter much in the same manner as if it were entirely regular and sanctioned by express law.

[7] The record in these consolidated appeals includes five large volumes, containing innumerable proceedings by, for, and against the receivership, and we find that we can do no better than to quote from the written opinion of the learned district judge, under whose eye the whole matter was carried on, as to the question of attorney's fees:

"After four years of the receivership, under the able management of Mr. Mitchell, his attorneys, and the expert accountant, Mr. Elkin Moses, every debt of the receivership has been paid, and part of the capital, some $16,000.00, remained to be distributed among the partners. It is seldom in the history of the courts that a receivership of this magnitude has come out so well. This was due to the able management of the receiver and his attorneys, and the expert, Mr. Elkin Moses, whom this court appointed.

"The attorneys for the receiver at once prepared and filed suit against the surety on the absconding receiver's bond, which resulted in a judgment in favor of the receiver for the recovery of the funds embezzled by the former receiver, Mr. Danziger, with legal interest from the date of the embezzlement, amounting to over $2,000.00. This amount was paid. A judgment was also obtained against Danziger

for the 20 per cent. penalties on the amount embezzled.

"Some of those who lost their lives in the cofferdam accident instituted suit for damages. They came up for trial. The first suit, that of Mrs. Lutenbacher, resulted in a verdict in her favor for $10,000.00. The Supreme Court [136 La. 805, 67 South. 888] affirmed that judgment.

"These damage suits, under the contract of insurance, had to be handled by Mr. Chas. P. Fenner, the attorney of the Ætna Life Insurance Company. The insurance company insured the Mitchell-Borne Construction Company for loss of life or injury to whom and when employed by up to the sum of $20,000.00, not to exceed $5,000.00 in any one case. The attorneys for the receiver had to assist Mr. Fenner in preparing the defenses and in attempting to defeat these damage suits or reducing the amount claimed. This entailed a great deal of work; it is also contained in the record. So well and ably were these cases tried that the receiver only lost $11,000.00 in damages, although the suits were for over $100,000.00, a surplus of $5,000.00 in the Lutenbacher Case, and of $6,000.00 in the two other suits.

"The creditors demanded payment of their bills from the time they were contracted. These claims had to be put off by negotiations, or contesting their right to claim interest until such time as the funds could be available with which to pay them. In these efforts, the attorneys for the receiver were successful. The correspondence, litigation, telephone conversations, interviews, were innumerable; the time of the attorneys was in constant demand, and one of the attorneys, Mr. Landry, for over three years devoted almost his entire time to this receivership.

"The attorneys made many attempts to obtain release of funds from the sewerage and water board, due for work performed, and they finally succeeded in having released $70,000.00 which the receiver used in settling with the creditors.

"The receiver, through his attorneys, made many attempts to borrow money from various banks during the course of the receivership, and the preparation of statements showing the status of the receivership took up a great deal of the attorney's time and attention.

"The attorney's services were also required in the settlement of the disputed claims of the Kaufman Company, the city of New Orleans, the terminal company, the New Orleans Railway & Light Company, and many others. The sewerage and water board claimed, under the contract, a large sum for demurrage; this the

attorneys for the receiver succeeded in defeating and settling by offsetting it with counterclaims of the receivership. The final task is the contesting of the claims made by the New Orleans Railway & Light Company and the Southern Surety Company in this litigation.

"The court is satisfied that the sum placed on the final account of the receivers for compensation of attorney's fees, $19,000.00, is just, reasonable and fair, and, everything taken into consideration, was fully earned by the faithful, able, and efficient services of the attorneys."

The record, we think, fully bears out the observations of the lower court; and, while the sum allowed might ordinarily be viewed as a large fee, still when the nature of the services rendered, the size of the estate administered, more than a half million dollars, are considered, and it is seen that the fee charged is less than 5 per cent., we think all reasonable ground of complaint disappears.

3. Opposition of Southern Surety Company: The lower court dismissed this opposition and rejected the demands of the surety against Mitchell-Borne Construction Company, upon the ground that it had not been called upon by its principal, the contractor, to take charge of the work, or to make the defenses to the litigation, or to do any other act requiring the expenditures claimed; but that same had been incurred on its own initiative, and for its own private benefit.

The surety relies upon the following clause in the application by Mitchell-Borne Construction Company, and the individual partners, for the bond, to wit:

"5. That the indemnitor will perform all of the conditions of said bond on the part of the indemnitor to be performed, and will at all times indemnify and keep indemnified the surety, and hold and save it harmless from and against any and all damages, loss, costs, charges and expenses of whatsoever kind or nature, including counsel and attorney's fees, whether incurred under retainer or salary or otherwise, which it shall or may at any time, sustain or incur by reason or in consequence of its suretyship, or procurement of suretyship, and will pay over to the surety, its successors and assigns, all sums and amounts of money which it or its representative shall pay or cause to be paid, or become liable to pay, on account of such suretyship, and on account of any damage, costs, charges and expenses of whatsoever kind or nature, including counsel and attorney's fees, whether incurred under retainer or salary or otherwise which it may pay, or become liable to pay, by reason of the same, or in connection with any litigation, investigation, collection or premium, or other matter connected therewith, such payment to be made to the surety as soon as it shall have become liable therefor, whether it shall have paid out said sum or any part thereof or not, and said surety is hereby authorized to prove such expenses, costs, and attorney's fees, in any action or proceeding and to include the same in any judgment."

There are three other clauses in the application (7, 12, and 19) which are pertinent to the issue now under consideration. No. 7 requires that, in event the surety shall be called upon to defend or otherwise participate in any action or litigation, the contractor shall promptly furnish the necessary funds therefor and pay any costs or expenses incurred therein. No. 12 provides that, upon notice to or discovery by the surety of any failure to perform any obligation under the contract, it shall have the right to take over the contract, machinery, etc., and complete the work at the expense of the contractor. No. 19 we quote in full, as follows:

"That the surety shall have the exclusive right for itself, and for the principal on said bond, to decide and determine whether any claim, demand, liability, suit, action, order, judgment or adjudication, made or brought against said surety and principal on said bond, jointly or severally, shall or shall not be defended, tried or appealed, and its decision shall be final and conclusive and binding upon the indemnitor, and any order, judgment or adjudication made, entered or affirmed as a result thereof, or any loss, cost, charge, expense or liability thereby incurred, sustained or paid shall be borne by the indemnitor, and the indemnitor especially consents thereto."

This application was the basis upon which the surety company agreed to become surety upon the bond, its stipulations had a legal and valuable consideration, and we see no

reason why they should not be enforced, in so far as they are applicable under a fair interpretation of the circumstances of this case.

[8, 9] It is a well-recognized principle of interpretation that general provisions of a contract are controlled or limited by specific stipulations dealing with a particular matter. The first section quoted (No. 5) binds the contractor or indemnitor (Mitchell-Borne Construction Company) to "hold and save it harmless from and against" any sum or expenditure which it might "sustain or incur by reason or in consequence of its suretyship" and any outlay so arising was and is a legitimate charge against the indemnitor. The surety's obligation was to protect the sewerage and water board against defaults of the contractor, and any sums incurred in discharging that obligation were "in consequence of the suretyship." It is not claimed that such payments were made or liability incurred. To sustain opponent's contention that it is entitled to recover for legal advice and services of experts rendered in anticipation of the possibility of such loss or expenditure under the bond when none had actually occurred, would, in our opinion, enlarge the contract, and add to the proviso to hold harmless against loss or expenditures "in consequence of the suretyship" one to reimburse it for expenditures made because of its fears or beliefs of the possibility or probability of future loss or damage, which were never sustained or occurred.

The suggestions just made are particularly applicable to the claim for engineer's fees, etc.

However, sections 7, 12, and 19 are more specific in their natures, and deal with the defense of suits, etc., and cases where the surety is called upon to act, either by the indemnitor, or in consequence of lawsuits filed against it and the contractor, and we think take such services without the fair restrictions of section 5 above noted. We think they reasonably bind the indemnitor or contractor to pay the surety for any service which it was called upon to perform, or for any attorney's fees or expenses which it may have incurred in the defense of any suit or action brought against it and the assured. The surety was called in to assist in having funds released to the contractor by the sewerage and water board, and to assist it in borrowing money elsewhere; it was also called upon to defend lawsuits filed against it and the assured. And we think it was justified in calling upon the partnership, through the receiver, to pay for the services and expenses so incurred. The only outlay on this score, which we are able to find from the record, was in the shape of advice and services of the attorney of the surety, and, since the attorney has made a charge of $3,500 for the entire service, we think a fair proportion for the work indicated would be $2,000, and that the surety is entitled to be placed on the account for that amount.

4. Opposition of Mrs. E. D. Borne, administratrix of the estate of Benjamin W. Borne, deceased: This opponent contends that the account was improperly confected, and also objects to the amount allowed the attorneys for the receiver. We have already disposed of the question of attorney's fees, and, while the account could have been gotten up and presented in a more complete form, still, when considered in connection with the detailed statements and reports of the accountant and auditor appointed by the lower court, we think it sufficiently reveals the gestion of the receiver to enable any one interested to determine just what funds and property were received, as well as the disposition made thereof.

Fees of Elkin Moses, Accountant.

In view of the large and complicated character of the receivership affairs, the lower court found it advisable to appoint an expert

accountant and auditor, in the person of one Elkin Moses, and after a review of the work performed as disclosed by the record, and the wisdom of his appointment, we do not think that the charge made is excessive.

For the reasons assigned, it is ordered, adjudged, and decreed that the judgment dismissing all of the oppositions and approving the account of the receiver be and is hereby amended so as to include thereon for payment out of the funds in his hands the sum of $2,000, to the Southern Surety Company as its attorney's fees; and otherwise the judgment of the lower court on the account be and the same is hereby affirmed; the costs of the appeal of the opponent Southern Surety Company to be paid out of the funds in the hands of the receiver, and the costs of the appeals of the other opponents to be paid by each of them, respectively. It is further ordered and decreed that the judgment of the lower court in the case of Southern Surety Company against the Mitchell-Borne Construction Company et al. be and the same is hereby annulled and reversed, and it is now ordered and decreed that the plaintiff therein have and recover judgment, against the said defendants for the full sum of $2,000, as a liquidation of the claim for attorney's fees allowed against the receiver, together with the costs of both courts.

MONROE, C. J., takes no part, not having heard the argument.